Judith A. PELECH, Plaintiff,

v.

KLAFF–JOSS, LP; Robert Davis, an individual; Crescent Cleaning Company, a Delaware corporation; Harry Finkel, an individual; Safeguard Security, Inc., an Illinois corporation; and Steven Rowley, an individual, Defendants.

No. 92 C 7127.

United States District Court,
N.D. Illinois, E.D.

June 23, 1993.

· George Vernon, Leng, Stowell, Friedman & Vernon, Nancy K. Baker, Law Office of Nancy K. Baker, Chicago, IL, for plaintiff.

Steven R. Peltin, Mary Ellen Nelligan, Altheimer & Gray, Irving M. Geslewitz, Much, Shelist, Freed, Denenberg, Ament & Eiger, P.C., Joseph Michael Gagliardo, James J. Convery, Peter Louis Albrecht, Laner, Muchin, Dombrow, Becker, Levin & Tominberg, Ltd., Chicago, IL, for defendants.

## *MEMORANDUM OPINION AND ORDER*

ASPEN, District Judge: ·

Plaintiff Judith Pelech brings this seven-count sexual discrimination and retaliatory discharge action against her erstwhile employers, Klaff–Joss, LP ("Klaff–Joss"), Crescent Cleaning Co. ("Crescent"), and Safeguard Security Intelligence Co., Inc. ("Safeguard"), along with several individual employees and officers of the three companies. Counts I through IV arise under Title VII of the Civil Rights Act of 1965, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and Counts V through VII include the state law claims of defamation, intentional infliction of emotional distress, and interference with a business expectancy. Presently before us is defendants' joint motion for partial summary judgment and to strike. For the following rea-

sons, we grant in part and deny in part defendants' joint motion for summary judgment and to strike, and deny plaintiff's motion to strike.

## I. Factual Background

For the purposes of this motion, the facts of this case are as follows:[1]

Beginning in May, 1987, Pelech was employed by Aegis Security Company ("Aegis") as a part-time security guard for the building located at 111 West Jackson Street in Chicago. Klaff–Joss owned the building, and Crescent, under contract to Klaff–Joss, provided cleaning services. In November, 1987, Aegis promoted Pelech to full-time security supervisor for the building.

Between August, 1988 and June, 1991, Pelech, while still employed by Aegis as a security supervisor, temporarily filled in for the position of elevator starter to cover the holiday and vacation absences of the permanent elevator starter. During this time, Pelech adequately performed both jobs.

In June, 1991, Pelech learned that the permanent elevator starter was retiring, leaving his position open. Armed with this news, Pelech informed Finkel, the chairman of Crescent, and Davis, the building manager at 111 West Jackson Street, that she wished to be considered for the position. Although Pelech had substituted for the elevator starter for close to three years, she was not interviewed for the job, and in July, 1991, Finkel and Davis decided to hire a man.

When Pelech confronted Davis to ask him why she was not considered for the opening, he informed her that she was "not qualified," and was not the person they were looking for. Unsatisfied with this explanation, Pelech telephoned her union representative to complain that she had been denied consideration for the position because of her gender.

In addition to calling her union representative in front of management personnel, Pelech openly advertised her conviction that she had been denied the elevator starter position because she was a woman.

In September, 1991, Safeguard Security, Inc. ("Safeguard") assumed Aegis' security contract at 111 West Jackson. Shortly thereafter, Finkel, Davis, and Rowley, the president of Safeguard, summoned Pelech into a meeting and allegedly informed her that unless she "smiled more," she would lose her job. In October, 1991, Rowley fired her from her position as security supervisor and dismissed her from Safeguard.

On March 16, 1992, Pelech filed charges of gender discrimination and retaliation against Klaff–Joss, Davis, Crescent, Finkel, Safeguard, and Rowley with the Equal Employment Opportunity Commission ("EEOC"). On October 6, 1992, the EEOC issued a "right to sue" letter. Although the charges Pelech submitted to the EEOC named the individual defendants (Davis, Finkel, and Rowley), the EEOC, pursuant to a policy which has bred much provoking litigation, eliminated the individual defendants from the charge and did not name them in the right to sue letter. Consequently, the EEOC did not invite any of the individual defendants to engage in conciliation proceedings designed to promote voluntary compliance. The parties do not agree on whether Davis, Finkel, and Rowley were ever notified that they were personally under investigation for possible Title VII violations.

## II. Discussion[2]

### A. Dismissal of Individual Defendants from Counts I, II, III, and IV (Title VII Claims)

The individual defendants seek summary judgment in their favor on the Title VII

---

1. This case is in an unusual posture. The defendants have moved for summary judgment on issues which could have been framed as motions to dismiss had this been earlier in the litigation. Consequently, they have offered little evidentiary support for their claims. As a result, most facts are disputed, and we view them in the light most favorable to the non-movant plaintiff.

2. Although Pelech has not raised the issue, it appears that two of the defendants, Crescent and Finkel, have not filed answers to the complaint. Furthermore, ten days has long since elapsed since our denial of Crescent and Finkel's motion to dismiss. Rather than entering a default judgment against these defendants, we instruct them to file an answer within ten days of the issuance of this opinion and direct them to apprise the Court of anything contained therein which might require us to alter our findings here.

claims on the grounds that they were not named in the underlying EEOC charge, as required under Title VII. *Perkins v. Silverstein*, 939 F.2d 463, 471 (7th Cir.1991). While the parties agree that an unnamed party may be sued where that party has received adequate notice of the charge and is afforded the opportunity to participate in any conciliation efforts, *Schnellbaecher v. Baskin Clothing Co.*, 887 F.2d 124, 126 (7th Cir. 1989), they disagree about whether the individual defendants here received such notice.

Recently, we addressed the exact issue presented here. In *Pommier v. James L. Edelstein Enterprises*, 816 F.Supp. 476 (N.D.Ill.1993), defendants, whose names had been excluded from the right to sue letter by the EEOC, sought to dismiss the Title VII action against them. Rather than reaching the question of whether the defendants had received adequate notice, we concluded that supervisors could not be held personally liable for alleged Title VII violations. *Id.* at pp. 481.

Title VII prohibits "employers" from discriminating against individuals on the basis of "race, color, religion, sex or national origin." 42 U.S.C. §§ 2000e–2(a), (b). An "employer," in turn, is "a person engaged in industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding year, and any agent of such person...." *Id.* § 2000e(b). Although the Seventh Circuit has yet to rule on whether given supervisors or officers are "employers" within the meaning of Title VII, both this Court and one of the two other courts in this district to address the question have concluded that individual supervisors are not "employers" who can be sued under Title VII in their individual capacity. *Id.*; *Weiss v. Coca–Cola Bottling Co.*, 772 F.Supp. 407, 410–11 (N.D.Ill.1991) (court reasoned that a supervisor liable as an employer's agent is really only a surrogate for the employer and is thus only liable in his official, as opposed to individual, capacity). Along with the *Weiss* court, we observed that "[t]his result is bol-

stered by the fact that the remedies available under Title VII (prior to the 1991 amendment) are remedies which an employer, not an individual, would generally provide—*i.e.*, back pay, reinstatement and other equitable relief if warranted." *Id., citing Weiss*, 772 F.Supp. at 411. Although the individual defendants charged in this case include a chairman, president, and building manager, even these high-level officers and employees are "agents" rather than "employers" within the meaning of Title VII. That is, despite the authority these defendants may wield within their organizations, they merely act on behalf of a larger employing company. For example, even though Rowley might sign any backpay check made out to Pelech, the check itself would be issued by Safeguard, the actual employer. Additionally, as the Ninth Circuit noted in *Miller v. Maxwell's International Inc.*, 991 F.2d 583 (9th Cir.1993), "[i]f Congress decided to protect small entities with limited resources from liability, it is inconceivable that it intended to allow civil liability to run against individual employees." Because we continue to find this line of reasoning persuasive, we respectfully disagree with Judge Moran's recent conclusion, in *Vakharia v. Swedish Covenant Hospital*, Slip Op. 90 C 6548 (N.D.Ill. June 8, 1993), that a plaintiff may bring Title VII claims against an employee in his individual capacity. In keeping with *Pommier* and *Weiss*, we grant summary judgment in favor of Davis, Finkel, and Rowley on the Title VII claims contained in Counts I through IV of Pelech's complaint. *See also Miller v. Maxwell's Int'l. Inc.*, 991 F.2d 583 (9th Cir.1993) (individual employees may not be held liable for damages under Title VII); *Harvey v. Blake*, 913 F.2d 226 (5th Cir.1990) (employees may only be held liable in their official capacities under Title VII).

**B. Preemption of Counts II and III by the National Labor Relations Act [3]**

Defendants argue that Counts II and III are preempted by the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 151 *et seq.*, under the so-called *Garmon* doctrine.

---

**3.** Although defendants argue that Count VII is also preempted by the NLRA, due to our finding, below, that Count VII is preempted under § 301 of the LMRA, we will not address defendants' arguments here.

In *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), the Supreme Court confronted the question of whether courts could entertain state law claims implicating rights protected by the NLRA. Fearful of conflict between state and federal regulatory schemes, the Court ruled that

> [w]hen an activity is arguably subject to § 7 or § 8 of the [NLRA], 29 U.S.C. §§ 157, 158, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference is to be averted.

*Id.* at 245, 79 S.Ct. at 780. Defendants contend that Counts II and III, setting forth Title VII claims of retaliatory discharge and ongoing retaliation, are nothing more than artfully drafted assertions of activity covered by §§ 7 and 8 of the NLRA and are therefore preempted.

Because we disagree with defendants' essential assumption that *Garmon* applies to Title VII actions, we must deny their motion to dismiss Counts II and III on this ground. *Garmon* was designed to address very specific dangers—namely, conflict between state and federal systems for regulating labor activity, and incursion into the territory of the NLRB. Not only is the former danger not presented by Title VII claims, but *Garmon* has never been applied to preempt the hearing of a federal, as opposed to a state, claim.[4] Moreover, while courts have set about protecting the NLRB's jurisdiction over labor disputes, Congress has clearly mandated that federal courts have jurisdiction to decide cases of employment discrimination. For these reasons, it is not surprising that the scant references made to the interplay of Title VII and the NLRA suggest that the

statutes offer concurrent remedies.[5] *See, e.g., Local Union No. 12, United Rubber, Cork, Linoleum & Plastic Workers of America v. NLRB,* 368 F.2d 12, 24 (5th Cir.1966) (concurrent remedies available under NLRB and Title VII) (dictum); *Emporium Capwell Co. v. Western Addition Community Org.,* 420 U.S. 50, 95 S.Ct. 977, 43 L.Ed.2d 12 (1975) (implicit in Court's discussion is the notion that workers can obtain relief from discrimination under either the NLRA or Title VII). *Cf. De Malherbe v. Intern. Union of Elevator Constructors,* 438 F.Supp. 1121 (N.D.Calif.1977) (district court's jurisdiction to hear § 1981 claim not preempted by NLRB jurisdiction). Accordingly, we find that Counts II and III are not preempted by the NLRA.

## C. Preemption of Counts II, III, V, VI, and VII by § 301 of the Labor Management Relations Act

Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a), confers jurisdiction on federal courts over disputes involving violations of collective bargaining agreements. In an effort to ensure uniformity of adjudication, the Supreme Court has ruled that "if the resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement," the state-law claim is preempted. *Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 108 S.Ct. 1877, 1885, 100 L.Ed.2d 410 (1988); *Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985); *Teamsters v. Lucas Flour Co.,* 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962). However, the Court emphasized that "an application of state law is pre-empted by § 301 of the [LMRA] only if such application requires the interpretation of a collective bargaining

---

**4.** Defendants' reliance on *LaBuhn v. Bulkmatic Transport Co.,* 865 F.2d 119 (7th Cir.1988) is unavailing, as the claim at issue there derived from state common law, rather than from a federal statute.

**5.** We note that the question of whether Title VII and the NLRA offer concurrent remedies appears to be an open one, and further observe that Count III, in particular, highlights the overlap between the two statutory schemes at play here.

Title VII prohibits employers from retaliating against employees who protest discriminatory treatment or policies. The NLRA protects a worker's right to engage in concerted activity, including the exercising of rights guaranteed the worker under a collective bargaining agreement. Both acts provide relief, then, when an employee chooses to oppose employer discrimination by availing herself of her right, under the collective bargaining agreement, to file a union grievance.

agreement."[6] *Id.* The Seventh Circuit has read *Lingle* to permit a state court to look at the same facts that would govern the outcome of a contract claim, but to require preemption only where a court would be required to interpret any term of a collective bargaining agreement. *See Pantoja v. Texas Gas and Transmission Corp.*, 890 F.2d 955, 959 at n. 1 (7th Cir.1989) (court held that § 301 did not preempt retaliatory discharge claim where complaint frequently referred to collective bargaining agreement, but did not require interpretation of any terms) *citing Lingle*, 486 U.S. at 408–09, 108 S.Ct. at 1883.

### (i) Counts II and III

█ ▪ Defendants argue that Pelech's Title VII claims are preempted by § 301. Just as we found the *Garmon* doctrine inapplicable to federal statutes, we find § 301 inapposite when applied to Title VII. The purposes of § 301 are not subverted when a federal court hears a claim brought under a federal statute. Accordingly, we deny defendants' motion for summary judgment on Counts II and III.[7]

### (ii) Count V

Defendants also argue that resolution of Pelech's state law claims of defamation (Count V), intentional infliction of emotional distress (Count VI), and tortious interference with a business expectancy (Count VII) requires this Court to interpret the collective bargaining agreement at hand. We turn first to Count V.

█ Under Illinois law, a statement is defamatory if it is published to third parties and is the sort of statement likely to be injurious to a person's reputation. *Mittelman v. Witous*, 135 Ill.2d 220, 552 N.E.2d 973, 142 Ill.Dec. 232 (1989). Pelech asserts that the defendants committed defamation *per se* when they accused her of theft and then published these accusations, along with allegations that Pelech was involved in illegal drug trafficking and an illicit affair with a married co-worker, to her fellow employees and tenants of the building where she worked. Defendants maintain that the statements regarding the alleged theft are true, thus absolving them of any liability.

Resolution of this claim does not appear to require the interpretation of any terms of the collective bargaining agreement.[8] Instead, evaluation of Count V, in light of plaintiff's allegations and defendants' defenses, simply involves determination of (1) whether Pelech did, or did not, steal a co-worker's calculator, (2) whether defendants did, or did not, publish statements that Pelech was engaged in drug trafficking, (3) whether the latter statements are true, and (4) whether defendants made the alleged statements with malice. Nothing in such an evaluation requires us to look to the collective bargaining agreement, let alone interpret it. *See, e.g., Mitchell v. Pepsi–Cola Bottlers, Inc.*, 772 F.2d 342, 348 (7th Cir.1985) (although ultimately dismissed under the doctrine of pendent jurisdiction,

---

**6.** Unlike the NLRA, which "preempts state law on the basis of the subject matter of the law in question, § 301 pre-emption merely ensures that federal law will be the basis for interpreting collective-bargaining agreements, and says nothing about the substantive rights a State may provide to workers when adjudication of those rights does not depend upon the interpretation of such agreements." *Lingle*, 486 U.S. at 409, 108 S.Ct. at 1883.

**7.** In any event, even if § 301 applied to Title VII actions, Counts II and III are essentially retaliation claims. The Seventh Circuit has consistently held that § 301 does not preempt retaliatory discharge cases. *See Pantoja*, 890 F.2d 955; *Nelson v. Central Illinois Light Co.*, 878 F.2d 198, 201 (7th Cir.1989); *Douglas v. American Information Technologies Corp.*, 877 F.2d 565 (7th Cir.1989). These holdings reflect the fact that in retaliatory discharge cases courts need not ven-

ture beyond a determination of whether an employer's termination decision was motivated by the employee's filing of a claim or other method of opposition. In this case, we need not interpret any term of Pelech's collective bargaining agreement to determine whether defendants' conduct resulted from retaliatory motives.

**8.** Interestingly, we can imagine that interpretation would be necessary where a defendant-employer claims qualified privilege, thus necessitating review of the collective bargaining agreement's terms to determine whether the disputed communications fell within the scope of defendant's duties. However, defendants have not asserted such an affirmative defense here, nor would it make a difference in this instance, where plaintiffs have pleaded malice—a burden they need only shoulder once defendants have established a qualified privilege.

employee's defamation claim would have survived preemption under federal labor law). Accordingly, Count V is not preempted by § 301.

### (iii) Count VI

 Under Illinois law, to establish intentional infliction of emotional distress, the plaintiff must demonstrate (1) that defendant's conduct was extreme and outrageous, (2) that the defendant intended his conduct to inflict severe emotional distress, or that he knew there was a high probability that his conduct would cause severe emotional distress, and (3) that the conduct actually caused such distress. *See McGrath v. Fahey*, 126 Ill.2d 78, 533 N.E.2d 806, 809, 127 Ill.Dec. 724, 727 (1988). While outrageous conduct is essential to an action for intentional infliction of emotional distress, a court will not find such conduct where the defendant "'has done no more than to insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress.'" *Public Finance Corp. v. Davis*, 66 Ill.2d 85, 360 N.E.2d 765, 810, 4 Ill.Dec. 652, 655 (1976) (quoting Restatement (Second) of Torts § 46, comment g (1965)). As the *Douglas* court pointed out, however, in order to determine whether an employer's conduct was "extreme and outrageous," a court may have to not only refer to the collective bargaining agreement, but to interpret its terms to establish whether the employer's actions were permitted under the agreement. *See Douglas*, 877 F.2d at 571 (Court stated that "a court's determination of whether the defendant's allegedly wrongful conduct was 'extreme and outrageous' may turn on the meaning of various provisions of the collective bargaining agreement.").

Consequently, courts have routinely held that state claims for intentional infliction of emotional distress which stem from an employer's method of investigating or discharging an employee are preempted under § 301. *See Id.* at 573; *Mock v. T.G. & Y. Stores Co.*, 971 F.2d 522 (10th Cir.1992); *Willis v. Reynolds Metals Co.*, 840 F.2d 254 (4th Cir.1988); *Johnson v. Anheuser Busch, Inc.*, 876 F.2d 620 (8th Cir.1989); *Bagby v. General Motors Corp.*, 976 F.2d 919 (5th Cir.1992). However, in *Keehr v. Consolidated Freightways of Delaware, Inc.*, 825 F.2d 133, 137 (7th Cir.1987),

the court held that, absent any suggestion by defendants that the tort claims in question derived from rights or duties under the contract, they did not require interpretation of the agreement and were not preempted under § 301. As a result of this case law, the parties here are battling over the characterization of Pelech's state law claims.

Pelech maintains that her claim for intentional infliction of emotional distress does not stem from the outrageous manner in which defendants went about investigating a legitimate allegation and terminating her employment, but stems from the defendants' decision to discriminate against her and to trump up theft charges as a pretext for firing her in retaliation for her complaints. On the other hand, defendants aver that their conduct conformed to collective bargaining agreement guidelines, therefore any determination of whether their behavior was "extreme and outrageous" must necessarily drag this Court into an interpretation of those agreement provisions governing the investigation of alleged employee wrongdoing and termination for cause.

At this stage of the litigation, neither plaintiff nor defendants have set forth facts indisputably establishing either that Pelech did, or did not, steal a calculator, or that the defendants were, or were not, engaged in a scheme to harass and terminate Pelech in retaliation for her complaints about discrimination. However, what is clear, is that for the purposes of this motion, we are bound by the nature of Pelech's allegations. Pelech is not alleging that the defendants' "extreme and outrageous" conduct derives from their abuse of procedures established under the agreement, but rather that it stems from their alleged concoction of theft allegations against her for the purpose of firing her. Given this understanding of Count VI, we find that it is not preempted by § 301. *See Keehr*, 825 F.2d at 137.

### (iv) Count VII

 In Count VII, Pelech charges the three individual defendants with tortious interference with a business expectancy. Specifically, Pelech alleges that the defendants

maliciously and unjustly interfered with her legitimate expectancy of continued employment with Safeguard, under the terms of her collective bargaining agreement, by falsely accusing her of theft and by otherwise participating in her termination. Defendants argue that resolution of this claim requires interpretation of the collective bargaining agreement.

Regardless of defendants' motivation for interfering with Pelech's business expectancy with Safeguard, litigation of this claim will necessarily involve the Court in interpreting provisions of the collective bargaining agreement. At the very least, as a threshold issue, we will have to assess whether or not Pelech had a valid business expectancy with Safeguard under the collective bargaining agreement—that is, whether Safeguard could have fired her absent good cause, what constituted good cause, and whether such cause existed. Accordingly, § 301 preempts Count VII.[9]

### D. Failure of Count III to State a Cause of Action Under Title VII

█ In Count III, Pelech alleges that "after [she] filed her Complaint with the [CCHR], Defendants began a concerted campaign to discredit Plaintiff in the manner alleged above for the purpose of deterring her from pursuing her legal rights and to deter co-workers from speaking in her behalf by threatening their job security." Cmplt. at ¶ 56. Pelech further alleges that these actions "were in retaliation for [her] filing her union grievance and her Complaint with the Commission, which are protected activities under the Act." Cmplt. at ¶ 57. It is uncontested that Pelech lodged these complaints after her discharge. Arguing that Title VII does not provide relief for post-termination events, defendants seek to dismiss Count VII for failure to state a claim.

Although in Bilka v. Pepe's, Inc., 601 F.Supp. 1254, 1259 (N.D.Ill.1985), this Court ruled that a former employee may state a claim for relief under § 704(a) of Title VII based on reprisal by a former employer, the

reasoning underpinning our decision appears to conflict with the Seventh Circuit's more recent holding in Reed v. Shepard, 939 F.2d 484, 493 (7th Cir.1991). In Reed, a former employee brought suit against the Sheriff's Department for sexual discrimination and harassment. In retaliation for her refusal to drop her suit, the Department allegedly initiated a grand jury investigation into her alleged illegal jail activities and sponsored (1) physical attacks on her person by an assailant who urged her to drop her suit, (2) late-night phone calls threatening reprisals for her suit, and (3) even a drive-by shooting of the car she was driving—all post-discharge. The Seventh Circuit held that the plaintiff could not maintain a Title VII action against her former employer for these post-termination retaliatory activities because "[u]nder § 2000e–3(a), it is an employee discharge or other employment impairment that evidences actionable retaliation, and not events subsequent to and unrelated to his employment." Id. at 493 (emphasis in the original).

The reasoning employed by the Seventh Circuit has been followed by at least one other circuit. In Polsby v. Chase, 970 F.2d 1360 (4th Cir.1992), the Fourth Circuit elaborated on Reed's logic, explaining that not only does Title VII's language not support the inclusion of actions brought by former employees, but the equitable remedies typically available under Title VII, such as back pay and reinstatement, are not the sort that would relieve a former employee's complaints of post-employment retaliation. Id. at 1364–1367. Moreover, as the Reed court observed, plaintiffs seeking redress for post-employment acts can still avail themselves of other equitable and legal remedies, such as state law damage claims, injunctions, or, in the case of Reed itself, possible criminal charges. Bound as we are by the Seventh Circuit's decision in Reed, and directed by its reasoning, we conclude that Count III must be dismissed.

### E. Failure of Count V to State a Claim for Defamation

█ In Illinois, to make out a claim for defamation, a plaintiff must demonstrate

---

9. Because we find Count VII preempted, we need not address defendants' additional grounds for summary judgment on Count VII.

that the defendant made a false statement about him to a third party, and that the statement caused injury to the plaintiff. *Krasinski v. United Parcel Service, Inc.*, 124 Ill.2d 483, 530 N.E.2d 468, 125 Ill.Dec. 310, 313 (1988). If, as is common in employment settings, qualified privilege becomes an issue, plaintiff may overcome it by pleading and proving that the statements were made with actual malice. *Id.* Defendants contend that Count V fails to state a claim for defamation since plaintiff fails to specify the words alleged to be defamatory, or how and to whom the words were published. Plaintiffs respond that they have sufficiently pleaded the elements of defamation, pointing out that she has alleged (1) that defendants falsely accused her of theft, and (2) that defendants published this accusation to Pelech's co-workers, tenants of the building, and others. We agree with Pelech that she has adequately pleaded defamation.

■ Federal pleading requirements, which govern this action, generally require a plaintiff in a defamation suit to plead the precise language alleged to be defamatory. *Vantassell–Matin v. Nelson*, 741 F.Supp. 698, 707 (N.D.Ill.1990) (Shadur, J.). The use of *in haec verba* pleadings is designed to ensure that defendants are able to respond to the complaint. Here, while Pelech has not alleged the exact language used, defendants have sufficient information with which to form responsive pleadings. That is, they are on notice that plaintiff seeks to hold them liable for making known their accusations that she stole something. Because this is not a situation in which the precise wording of the statements is likely to affect their interpretation, we find that Pelech's failure to plead them does not sink this claim.

Pelech's failure to allege who made the defamatory statements and to whom they were made, however, is more troubling. Absent any allegations regarding the making of the statements, other than the general assertion that defendants made them, the defendants would seem to be at a disadvantage in trying to formulate responsive pleadings. While Pelech's pleadings are not as specific as one might hope, we nonetheless find them adequate to permit defendants to answer, as,

in fact, they have done. Accordingly, we deny defendants' motion to dismiss Count V for failure to state a claim.

**F. Failure of Count VI to State a Claim**

■ In order to be held liable for intentional infliction of emotional distress, a defendant's conduct must be "extreme and outrageous," and the plaintiff must have suffered severe emotional distress. *Public Finance Corp. v. Davis*, 66 Ill.2d 85, 360 N.E.2d 765, 4 Ill.Dec. 652 (1977). In Illinois, conduct will be found extreme and outrageous if it goes "beyond all possible bounds of decency," and plaintiff's distress will be found severe if "no reasonable man could be expected to endure it." *Id.* 360 N.E.2d at 767, 4 Ill.Dec. at 654. Defendants argue that plaintiff has failed to allege facts which establish that defendants engaged in sufficiently extreme and outrageous behavior to support a claim for intentional infliction of emotional distress.

There are no hard and fast rules regarding what constitutes "extreme and outrageous" conduct. However, Illinois courts have noted that in an employment setting, conduct must be particularly egregious to support an emotional distress claim, else "nearly all employees would have a cause of action for intentional infliction of severe emotional distress." *Heying v. Simonaitis*, 126 Ill.App.3d 157, 466 N.E.2d 1137, 1144, 81 Ill.Dec. 335, 342 (1st Dist.1984). Even with this stricture, it is no easy task for courts to determine when to describe conduct as "extreme and outrageous."

Citing *Miller v. Equitable Life Assurance Society*, 181 Ill.App.3d 954, 537 N.E.2d 887, 889, 130 Ill.Dec. 558, 560 (1st Dist.1989), defendants argue that behavior more extreme than that alleged by Pelech has been found insufficient to support an emotional distress claim. In *Miller*, the plaintiff complained that she was surrounded by rude, vulgar, uncooperative, unprofessional, and unfair co-workers and supervisors, and the court held that while it did not condone the alleged behavior, it was not so extreme as to exceed all bounds of human decency. *Id.* Unlike *Miller*, however, the plaintiff here has alleged not only offensive behavior, but the aggravating circumstance of retaliation.

In *Johnson v. Federal Reserve Bank,* 199 Ill.App.3d 427, 557 N.E.2d 328, 145 Ill.Dec. 558 (1st Dist.1990), the plaintiff alleged that in retaliation for his exposure of various illegal practices by the defendant, the defendant harassed him by threatening to fire him, giving him extra work, requiring him to work longer hours than other employees in his department, giving him poor reviews, and blocking his advancement within the company. Although the court observed that the treatment plaintiff received could not have been deemed "extreme and outrageous," had it been a genuine effort to correct an employee's performance, "the [defendant's] conduct, though not extreme and outrageous *per se,* became so by its retaliatory and punitive nature." *Id.* 557 N.E.2d at 331, 145 Ill.Dec. at 561. Here, Pelech has alleged that the defendants in this action mounted an intentional campaign to discredit and terminate her in retaliation for her opposition to alleged discrimination. While lacking the exacerbating factor that defendants knew that Pelech was susceptible to emotional distress, we find that plaintiff has alleged facts sufficient to support her claim.

### G. Preemption of Count VI by the Illinois Workers Compensation Act

█ In its final attack on Count VI, defendants maintain that Pelech's claim for intentional infliction of emotional distress is preempted by the Illinois Workers Compensation Act ("IWCA") with respect to the company defendants. The IWCA contains an exclusivity provision which prevents a plaintiff from bringing a common law suit against an employer for accidental injuries sustained in the workplace and compensable under the Act. Ill.Rev.Stat. ch. 48, § 138.5(a). An injury intentionally inflicted by a co-employee may still be accidental within the meaning of the IWCA if the employer did not encourage, direct, or expressly authorize the co-employee's actions. *See Meerbrey v. Marshall Field & Co.,* 139 Ill.2d 455, 564 N.E.2d 1222, 151 Ill.Dec. 560 (1990):

█ In Count VI, Pelech fails to identify any actions taken by the company defendants

suggesting that they encouraged, directed, or authorized the nefarious conduct of the individual defendants. *Meerbrey* instructs, however, that *respondeat superior* is not a valid basis for avoiding preemption, unless the individual employee accused of the injurious acts is the alter ego of the company. *Id. See also Augustin v. Mason,* 60 Empl. Prac.Dec. (CCH) ¶ 41, 890, 1992 WL 245627 (N.D.Ill.1992) (where president of a company, accused of intentional infliction of emotional distress, was not the alter ego of the company, IWCA barred claims against the company). Pelech has not alleged that any of the individual defendants were the alter egos of their companies.

█ Our inquiry is not at an end, however, but is complicated by Pelech's assertion that neither Klaff–Joss nor Crescent are her "employers" within the meaning of the IWCA. Defendants challenge this averment, claiming that if Pelech had an employment relationship with Klaff–Joss and Crescent for the purposes of Title VII,[10] then she must have an employment relationship with the two companies for the purposes of the IWCA. While there is a superficial appeal to the defendants' contention, it is ultimately hollow, as the purposes of the two acts and, relatedly, the factors to be considered in determining whether an employment relationship exists for each, differ. Consequently, it is altogether possible that a company could be in a position to control or interfere with a plaintiff's opportunities to gain employment, while not being in a position to control the employment itself, or to hire, pay, or fire the plaintiff.

█ Here, Pelech has not alleged that either Klaff–Joss or Crescent controlled her employment, only that they were in a position to thwart her opportunity to gain employment or that they denied her employment. Without more, we cannot conclude that either Klaff–Joss or Crescent were Pelech's "employers" within the meaning of the IWCA. Accordingly, we find that the IWCA preempts Count VI as directed against Safeguard, but not against Klaff–Joss, Crescent, or the individual defendants.

10. For a fuller discussion of this issue, see *Pelech* *v. Klaff–Joss,* 815 F.Supp. 260 (N.D.Ill.1993).

**536**

### H. Defendants' Motion to Strike Requests for Compensatory and Punitive Damages, Front Pay, and a Jury Trial for Title VII Claims

■ Defendants move this Court to strike Pelech's request for compensatory and punitive damages, front pay, and a jury trial regarding her Title VII claims. It is beyond dispute that, prior to its amendment by the Civil Rights Act of 1991, Title VII did not allow compensatory or punitive damages, *Bohen v. City of East Chicago,* 799 F.2d 1180 (7th Cir.1986), or jury trials, *Grayson v. Wickes Corp.,* 607 F.2d 1194 (7th Cir.1979). It is equally incontrovertible, that the amendments to Title VII, which permit compensatory and punitive damages, as well as jury trials for such claims, became effective in November, 1991 and do not apply retroactively. *See Luddington v. Indiana Bell Telephone Co.,* 966 F.2d 225, 229–30 (7th Cir. 1992) ("the new act is applicable only to conduct engaged in after the effective dates . . . in the act, at least if the suit has been brought before the effective dates."); *Jaskowski v. Rodman & Renshaw, Inc.,* Slip Op. 92 C 4161 (N.D.Ill. February 19, 1993) (This Court held that *Luddington*'s logic applied equally to claims brought after the effective dates of the Act). Because it is undisputed that Pelech was fired before November, 1991, and because we have dismissed her claims for ongoing discrimination (which might have covered actions occurring after the effective date of the Act), we hereby strike her request for compensatory and punitive damages and a jury trial.

■ However, we will not strike Pelech's request for front pay. While the Seventh Circuit has never directly ruled that front pay is available under Title VII, in *McKnight v. General Motors Corp.,* 908 F.2d 104, 117 (7th Cir.1990), they expressly left that question open for the district court to decide on remand. Subsequently, the district court found that front pay was, indeed, available under Title VII. *McKnight,* 768 F.Supp. 675, 680 (E.D.Wis.1991), *citing Weaver v. Casa Gallardo, Inc.,* 922 F.2d 1515, 1528 (11th Cir.1991); *Carter v. Sedgwick County, Kansas,* 929 F.2d 1501, 1505 (10th Cir.1991);

*Edwards v. Occidental Chemical Corp.,* 892 F.2d 1442, 1449 (9th Cir.1990); *Shore v. Federal Express Corp.,* 777 F.2d 1155, 1159 (6th Cir.1985), *aff'd McKnight v. General Motors Corp.,* 973 F.2d 1366 (7th Cir.1992). Accordingly, we deny defendants' motion to strike Pelech's request for front pay.

### I. Plaintiff's Motion to Strike

■ Last in the chain of issues before this Court, is plaintiff's motion to strike defendants' Reply Memorandum. In their Reply, defendants' questioned Pelech's counsel's ("Baker") assertion that her first notice that the individual defendants had been deleted from the EEOC charge was when she received the right to sue letter from the EEOC on October 6, 1992.[11] As evidence that Baker knew prior to October 6 that the EEOC had dropped the individual from the charges, Defendants point to an August 25, 1992 letter Baker sent to the EEOC, in which she listed the charge numbers of each party and identified only the company defendants, not the individuals. Baker not only protests defendants' assertion, but seeks to strike the memorandum in which it appears.

Baker appropriately emphasizes the seriousness of defendants' implicit attack on her honesty. In law, as in life, one's integrity is precious, and most lawyers hold it dear. We do not approve of an attorney lightly besmirching another's reputation with unfounded, or poorly supported, allegations. Moreover, defendants' evidence that Baker misrepresented facts to this Court is not compelling, particularly in light of the responses Baker received from the individual defendants, suggesting that they had been charged and were participating in the EEOC investigation.

We recognize, however, that attorneys are advocates, bound to make arguments which could advance their clients' interests. While we hope they will exercise good judgement in selecting their arguments, we will not intercede unless their points are void of merit. In this case, while defendants' observation "that there is reason to question Plaintiff's counsel's assertion that her first notice of the

**11.** Counsel made this assertion in an affidavit filed with the Court.

deletion of the individuals was when she received the right to sue letter on or about October 6, 1992," has limited support, it has a sufficient basis to prevent us from striking it. Accordingly, we remind defendants and their counsel not to tread cavalierly on the reputation of others, but deny plaintiff's motion.

### III. Conclusion

For the foregoing reasons, we grant in part and deny in part defendants' joint motion for summary judgment, grant its motion to strike, and deny plaintiff's motion to strike. It is so ordered.